IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Action No. 5:22-CR-00002 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| LUIS GERARDO RAMIREZ | ) | |
| MONJARAZ, | ) | |
| | ) | By:    Hon. Thomas T. Cullen |
| Defendant. | ) | United States District Judge |

Defendant Luis Gerardo Ramirez Monjaraz ("Ramirez") was arrested on November 23, 2021, and later indicted on charges of kidnapping a minor in violation of 18 U.S.C. §§ 1201(a)(1) and 1201(g) (Count I), transporting illegal aliens for private financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(i) (Count II),[1] and illegal reentry after prior removal in violation of 8 U.S.C. § 1326(a) (Count III). (*See* Indictment [ECF No. 1].) This matter is before the court on Ramirez's motions to suppress (1) physical evidence uncovered from a search of his vehicle on the side of Interstate 81 (ECF No. 51), (2) statements he made to deputies and a state magistrate during and after his arrest (ECF No. 55), and (3) data uncovered from a search of his cellphone pursuant to a warrant (ECF No. 53). Ramirez's motions to suppress have been fully briefed and the court held an evidentiary hearing on November 21, 2022, making these matters ripe for disposition. For the following reasons, Ramirez's motion to suppress evidence obtained during the vehicle search will be

---

[1] Ramirez pleaded guilty to Count II on November 21, 2022, a week before trial. (*See* ECF No. 100.) In addition, the court granted Ramirez's motion to sever Count Three (illegal reentry) and Count One (kidnapping) and to try these offenses separately.

denied; his motion to suppress statements will be denied as moot as to his on-scene statements

to deputies, but granted as to his statements to the magistrate; and his motion to suppress the

cell phone data will be denied.

## I.   BACKGROUND

Much of what gives rise to these motions was captured on body-worn camera

("bodycam") footage[2] from Frederick County Sheriff's Office Deputy Eric White. (*See* Video

A - Def.'s Hearing Ex. A [ECF No. 51-1]; Video B [ECF No. 51-2].) The bodycam footage,

November 21, 2022 hearing testimony,[3] and the parties' respective motion and hearing

exhibits compose the record for the court's decision.

On November 23, 2021, the Frederick County Sheriff's Office responded to a 911 call

alleging an abduction. (911 Call Recording - Govt.'s Hearing Ex. 1 [*See* ECF No. 98]; Def.'s

Mot. to Suppress Phone Search at 1 [ECF No. 53].) The caller, later identified as Juan Pablo

Ralda Reyes ("Reyes"), reported that a male subject—later identified as Ramirez—had "taken"

and driven away with his 16-year-old nephew ("Minor #1") in a black Nissan SUV displaying

Arizona temporary registration 31T6138. (*Id.*) When he called 911, Reyes was following

Ramirez in his personal vehicle. (*Id.*) Reyes was accompanied by his son, Spencer Pablo Ralda

("Ralda"). Deputy Travis Bridgeforth was dispatched and responded to the call. He pulled

over the Nissan matching the description on Interstate 81 at mile marker 311; Ramirez was

the driver. (*Id.*) Deputy Bridgeforth ordered Ramirez to unlock the doors and, when he

---

[2] Deputy White's bodycam footage is broken up into two non-continuous parts. Video footage is referred to in the "hh:mm:ss" format.

[3] As relevant to these motions, Deputy Bridgeforth and Middletown Police Officer Sandy Seabaugh testified at the November 21, 2022 hearing.

complied, Minor #1 ran from the Nissan to Reyes's vehicle, which was parked on the shoulder behind Deputy Bridgeforth's. Ramirez then attempted to drive away—Deputy Bridgeforth heard the vehicle's engine revving—but stand-still traffic on I-81 left Ramirez with nowhere to go. Accordingly, Deputy Bridgeforth reached into the vehicle and put the Nissan into park. He then ordered Ramirez out of the vehicle, detaining him without further incident. Deputy White arrived on the scene shortly thereafter.

Once the scene was secured, Deputy Bridgeforth left Ramirez with Deputy White and interviewed Reyes, who told Deputy Bridgeforth that he was Minor #1's uncle. Reyes explained that he had hired and paid Ramirez to bring Minor #1 from the U.S.-Mexico border to Virginia in exchange for $1,000 in cash. Reyes further explained that when Ramirez arrived with Minor #1 at their meeting point, he demanded an *additional* $1,000. When Reyes refused to pay the additional money, he claimed that Ramirez drove off with Minor #1 still in the vehicle.

As the deputies continued their on-scene investigation, they asked Ramirez questions, eliciting incriminating responses. For example, when they asked Ramirez "Where's the money?" Ramirez indicated the center console of his Nissan. The deputies then found several thousand dollars in the center console.

Because Ramirez was speaking Spanish to the deputies and Deputy Bridgeforth does not speak Spanish, Bridgeforth called a Spanish-speaking officer, Officer Sandy Seabaugh, to the scene to translate for him.[4] Using Officer Seabaugh as his translator, Deputy Bridgeforth

---

[4] Officer Seabaugh is an officer with the Middletown Police Department, a neighboring jurisdiction. Officer Seabaugh testified that she is fluent in Spanish and that it is her first language.

administered *Miranda* warnings to Ramirez. He read the *Miranda* warnings to Ramirez from a card that he uses for that purpose,[5] and Officer Seabaugh translated them. After receiving *Miranda* warnings, Ramirez indicated to Deputy Bridgeforth (through Officer Seabaugh) that he did not want to talk to them.

Still, Ramirez volunteered to Officer Seabaugh that Ralda had "pulled a gun on him" when he had met with Reyes and Ralda to transfer Minor #1 (Deputy Bridgeforth's Incident Report - Def.'s Hearing Ex. 1 [ECF No. 98-1].) Upon learning this, Deputy Bridgeforth interviewed Reyes and Ralda about the alleged gun. Ralda admitted that he had one in the vehicle. Deputy Bridgeforth then ran a law enforcement check, confirming that Ralda possessed a valid concealed weapons permit. But he did not take any additional steps to investigate the presence (or alleged prior use) of the firearm.

Deputy Bridgeforth transported Ramirez to the Northwestern Regional Adult Detention Center for a probable cause and bond hearing before a state magistrate, during which Ramirez allegedly made more incriminating statements—overheard by Deputy Bridgeforth—including what effectively amounted to a sweeping confession to counts I and II. According to Deputy Bridgeforth, Ramirez told the magistrate that he had transported Minor #1 to Virginia, and that he had driven away with Minor #1 after meeting with Reyes and Ralda. The magistrate determined that there was probable cause to support the arrest and ordered that Ramirez be held without bond. Deputy Bridgeforth subsequently obtained a search warrant to search Ramirez's cell phone, which led to police discovering even more

---

[5] Although Deputy Bridgeforth did not have the *Miranda* card with him in court, his testimony indicates that the warnings issued satisfied *Miranda*.

incriminating evidence and "downloading" the data on Ramirez's cell phone.

Ramirez's motions seek to suppress this evidence and his statements on various Fourth, Fifth, and Sixth Amendment grounds.

## II.     LEGAL STANDARD

"In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law." *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005)). "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993). A defendant has the burden of proof on his motion to suppress but, once he establishes a basis for his motion, the burden shifts to the government to justify its actions. *See U.S. v. Matlock*, 415 U.S. 164, 177–78 n.14 (1974); *U.S. v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981).

## III.    RAMIREZ'S MOTION TO SUPPRESS PHYSICAL EVIDENCE UNCOVERED DURING THE WARRANTLESS ROADSIDE VEHICLE SEARCH

Ramirez first moves to suppress the physical evidence police uncovered during the search of his SUV. (*See* ECF No. 51.) He argues that neither the search-incident-to-arrest nor inventory exceptions to the Fourth Amendment's warrant requirement apply. Because the search was plainly justified under the automobile exception to the Fourth Amendment's warrant requirement, however, Ramirez's motion will be denied.

### A. Applicable Law

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "The Fourth Amendment generally requires police to secure a warrant before conducting a search," *Maryland v. Dyson,* 527 U.S. 465, 466 (1999), but there are certain well-delineated exceptions to the Fourth Amendment's warrant requirement. *See Flippo v. West Virginia*, 528 U.S. 11, 13 (1999). For example, police do not need a search warrant to pursue a fleeing suspect who seeks to avoid arrest by running into a private home. *See United States v. Santana*, 427 U.S. 38, 42–43 (1976). Nor do police need a warrant to seize evidence that is in "plain view" and whose incriminating character is immediately apparent. *See United States v. Davis*, 690 F.3d 226, 233 (4th Cir. 2012). But absent an exception, a warrant is required, and "evidence obtained in violation of the constitution may be suppressed under the exclusionary rule." *United States v. Banks*, 482 F.3d 733, 738 (4th Cir. 2007) (citing *United States v. Perez*, 393 F.3d 457, 460 (4th Cir. 2004)).

"There is a well-established exception to the warrant requirement for automobile searches." *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir. 2010) (cleaned up). Under this exception, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Id.* at 589 (citing *Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996) (per curiam)). "The scope of a search pursuant to this exception is as broad as a magistrate could authorize. Thus, once

police have probable cause, they may search every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 590 (cleaned up). The government has the burden of proving that the automobile exception applies. *See United States v. Jeffers*, 342 U.S. 48, 51 (1951).

### B. Analysis

#### 1. The Vehicle Was Readily Mobile

"There are two justifications for the automobile exception. The Supreme Court's early cases were based on the mobility of the automobile. Unlike homes or other structures, cars 'can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.'" *Kelly*, 592 F.3d at 590 (quoting *Carroll*, 267 U.S. at 153). "More recent cases provide a second justification for the exception." *Id.* "Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976). "Unlike a home, a car has not been termed an owner's castle and, again unlike a home, an automobile ventures out in public. This lesser expectation of privacy thus stems from the fact that cars as movable public objects are subject to pervasive schemes of regulation." *Kelly*, 592 F.3d at 590 (cleaned up).

Regarding the first justification, the automobile exception applies without regard to "the degree of control police exercise over a vehicle." *Id.* at 591 (citing *United States v. Brookins*, 345 F.3d 231 (4th Cir. 2003)). Here (as in *Kelly*), the fact that there was more than one armed police officer on the scene and that Ramirez had been handcuffed and was eventually placed in a police cruiser places no limits on the police's authority to search the automobile (if

probable cause existed). And consistent with *Kelly*, this court declines to "recognize an exception to the automobile exception when the police have significantly reduced the likelihood that a car will be driven away" because, "even if [Ramirez] is correct that there was little risk that the [vehicle] would be driven away, it matters not. It is well established that the [automobile exception] 'does not have a separate exigency requirement.'" *Id.* at 590 (quoting *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam)). And as in *Kelly*, Ramirez's SUV was "operational and therefore readily mobile. Consequently, the police were not required to obtain a warrant before searching the car or the containers therein." *Id.*

### 2. The Deputies had Probable Cause to Believe that the Vehicle Contained Contraband

"Probable cause requires only 'a fair probability,' and not a prima facie showing, that 'contraband or evidence of a crime will be found in a particular place.'" *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause, in other words, is "not a high bar," and law enforcement officers are not obligated to "rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018).

Here, the deputies had ample probable cause to believe that Ramirez's SUV contained evidence of at least two of the offenses for which he was arrested—kidnapping and human trafficking. The 911 dispatcher had informed them of Reyes's 911 call alleging that an individual driving a black Nissan Armada with license plate 31T6138 had "taken" and driven away with Minor #1. Deputy Bridgeforth responded to the call and pulled over the car matching that description on Interstate 81 at mile marker 311, which Ramirez was driving. Deputy Bridgeforth ordered Ramirez to unlock the doors, and, when he complied, Minor #1

fled from the Nissan to Reyes's vehicle. Ramirez then attempted to drive away, even though the deputy was standing next to his SUV. *United States v. Mitchell*, 58 F. App'x 14, 15–16 (4th Cir. 2003) (holding that "[defendant] provided probable cause for his arrest by attempting to flee police").

With Ramirez detained and Deputy White on scene, Deputy Bridgeforth interviewed Reyes. Reyes told Deputy Bridgeforth that he was Minor #1's uncle, and that he had hired and paid Ramirez to bring Minor #1 to Virginia in exchange for $1,000. Reyes further explained that when Ramirez arrived with Minor #1 at their meeting point, he demanded an *additional* $1,000. When Reyes refused to pay the additional money, he claimed that Ramirez drove off with Minor #1 still in the vehicle. Indeed, after Deputy Bridgeforth interviewed Reyes, he approached Deputy White to discuss what he had learned, and the deputies expressly referred to Ramirez's impending criminal charges before undertaking any search:

> **Deputy Bridgeforth**: So, they hired [Ramirez] for $1,000 to bring [Minor #1] from Arizona to here. They pulled up today, gave him the money, and [Ramirez] pulled off with [Minor # 1] and demanded another $1,000. … What do you think? . . . He's 16 years old—the kid [Minor #1]."
>
> **Deputy White**: That's human trafficking.
>
> **Deputy Bridgeforth**: Yeah, basically. I mean at least kidnapping.
>
> **Deputy White**: Yeah I would say so at least. Does he have the $1,000 on him still?

(Video A at 14:31:40–14:32:23.) Furthermore, according to Reyes, he had just given the money to Ramirez, and they had just recently driven from the meeting point onto Interstate 81. (*Id.*; Video B 15:00:07–15:00:40.)

With this evidence, a neutral magistrate would undoubtedly have found probable cause to grant a search warrant for the entire vehicle. The center console was a logical place for the Deputies to initiate their search, and it is there that officers uncovered the cash and Ramirez's passport (*see* Video A 14:32:47–14:34:29), as well as a notebook and bank statements (*see* Video B 14:45:25–14:50:22). Accordingly, the deputies had probable cause that evidence of Ramirez's alleged crimes would be found inside the vehicle, and the scope of the search was reasonable.[6]

At oral argument and in his motion papers, Ramirez suggested that, once Minor #1 fled from the vehicle, any probable cause to search the vehicle evaporated, because the best evidence that a kidnapping had occurred (i.e., the minor himself) had already escaped from the vehicle. This argument defies common sense and legal precedent. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Kelly*, 592 F.3d at 589 (citing *Labron,* 518 U.S. at 940 (per curiam)). The probable cause was not limited to persons, but included any contraband, like evidence of the crimes—including cash (which was found), documents (which were found), restraints, other cell phones,[7] and any number of other items of physical evidence or contraband. Moreover, deputies had probable cause to search for *other*

---

[6] Ramirez contends that there were actually three searches—two on-scene warrantless searches and one pursuant to a warrant at the Frederick County Sheriff's Office. (Def.'s Br. Supp. Mot. to Supp. Physical Evidence at 3–4.) Regarding the two on-scene searches, Ramirez provides no authority that, once police are justified by probable cause in searching a readily mobile vehicle without a warrant on the scene of an active criminal investigation, they must complete the search uninterrupted once it is initiated. The police here acted reasonably in searching inside the vehicle as much as they did, and when they did, on scene.

[7] Deputies had uncovered only one cell phone on Ramirez's person, but experience and logic demonstrate that criminal suspects often use multiple phones.

*persons* who may have been secreted inside the vehicle as part of the "human trafficking" and "kidnapping" that they were investigating. The fact that Minor #1 had escaped from the vehicle did not vitiate the probable cause that evidence related to a kidnapping would be found in that vehicle.

Additionally, before searching the vehicle Ramirez had been driving, the deputies re-approached Ramirez, brought him over toward the vehicle, and began asking about the money allegedly exchanged. (Video A at 14:32:22–14:32:45):

> **Deputy Bridgeforth**: Did they give you money?
>
> **Ramirez**: Money?
>
> **Deputy White**: Sí. Dónde?
>
> **Ramirez**: [motioning with his chin toward the interior of the vehicle]
>
> [inaudible]
>
> **Deputy White**: What?
>
> **Ramirez**: In the car.
>
> **Deputy White**: [upon his opening the vehicle's front passenger-side door and pointing into the interior cabin toward the center console] In here?
>
> **Ramirez**: Yeah.

(*Id.*) Ramirez's statement to deputies that Reyes had given him money simply corroborated what deputies already knew—or at least had probable cause to believe. And Ramirez's clear indication that the cash was inside the vehicle—and motioning with his chin that, yes, it was in the center console area—was simply confirming an area within the scope of the vehicle that a magistrate would have authorized to search absent the statement and chin gesture.

Even without Ramirez's statements the deputies had probable cause to conduct the vehicle search within the scope that they did.

### 3. Ramirez's On-Scene Statements to Deputies Do Not Disturb the Vehicle Search's Validity

There is some intersection between the portion of Ramirez's motion to suppress that seeks to suppress his on-scene statements to deputies (ECF No. 55) and his motion to suppress physical evidence uncovered from his SUV (ECF No. 51). In this regard, Ramirez argues that "any piece of evidence obtained as a result of an illegal search is a 'fruit' of that illegal search and may not be offered as evidence *or used by the government to obtain evidence against someone whose rights have been violated*." (Def.'s Mot. to Supp. Statements at 7 (emphasis added).) On that basis, Ramirez asks the court to, among other things, "suppress the statements, *and the fruits of the statements*." (*Id.* at 10 (emphasis added).)

To the extent Ramirez is arguing that any evidence obtained as a result of his on-scene statements must be suppressed along with the statements themselves (if those statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 444 (1986)), he is simply wrong.[8] The court may still consider Ramirez's on-scene statements for purposes of determining whether the deputies had probable cause to search Ramirez's vehicle.

"[U]nreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." *United States v. Sterling*, 283 F.3d 216, 219 (4th Cir. 2002) (discussing the distinction between statements and derivative evidence) (quoting

---

[8] The government does not intend to introduce nor rely on Ramirez's on-scene statements in its case-in-chief at trial. (*See* Gov.'s Br. Opp. to Mot. to Supp. Statements at 2 [ECF No. 67].)   For that reason, as described below, that portion of Ramirez's motion to suppress his statements is being denied as moot.

*Dickerson v. United States*, 530 U.S. 428, 441 (2000)). In this regard, the *fruit of the poisonous tree* doctrine does not operate to bar physical evidence discovered as a result of statements obtained in violation of *Miranda. See Sterling*, 283 F.3d at 218; *Hill v. Clarke*, No. 3:12CV174, 2014 WL 6388431, at *7 (E.D. Va. Nov. 14, 2014). "[T]he *Miranda* rule is a prophylactic employed to protect against violations of the Self-incrimination Clause" of the Fifth Amendment. *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion). And the Self-incrimination Clause "cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements." *Id.* at 637. Where an unwarned statement is obtained voluntarily, the "core protection afforded by the Self-incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *Id.* at 636. In other words, "[t]he exclusion of unwarned [but voluntary] statements . . . is a complete and sufficient remedy" for a *Miranda* violation. *Id.* at 641–42 (quoting *Chavez v. Martinez*, 538 U.S. 760, 790 (2003) (Kennedy, J., concurring in part and dissenting in part)). So, even if the court held that Ramirez's on-scene statements should be suppressed because they were obtained in violation of *Miranda*, for the physical evidence from the SUV to (*also*) be suppressed, the court would have to find that (1) absent Ramirez's on-scene statements, the deputies did not have probable cause to search the SUV; and (2) the on-scene statements were involuntary. Neither inquiry cuts in Ramirez's favor.

The body-cam footage—the authenticity of which Ramirez has not challenged—of the entire interaction is before the court, establishing (1) the reasonableness of the deputies' actions under a Fourth Amendment totality-of-the-circumstances analysis, and (2) the

voluntariness of Ramirez's on-scene statements under a Fifth Amendment due process analysis.

As explained above, the deputies had probable cause to search Ramirez's vehicle independent of Ramirez's on-scene statements. But even if they did not, Ramirez's on-scene statements, when coupled with the totality of the attendant facts and circumstances, support a finding of probable cause to search the vehicle.

Indeed, Ramirez's on-scene statements were voluntarily made. "Because physical evidence discovered after a *Miranda* violation cannot be 'fruit of the poisonous tree,' the inquiry turns to the voluntariness of [Ramirez's] initial unwarned statement." *Hill v. Clarke*, No. 3:12CV174, 2014 WL 6388431, at *7 (E.D. Va. Nov. 14, 2014) (citing *United States v. Elie*, 111 F.3d 1135, 1143 (4th Cir. 1997)). "[A] statement is involuntary under the Fifth Amendment only if it is 'involuntary' within the meaning of the Due Process Clause." *Elie*, 111 F.3d at 1143 (citing *Oregon v. Elstad*, 470 U.S. 298, 304 (1985)). *This* question, in turn, requires the court to determine "whether the confession was extracted by any sorts of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (cleaned up).

"[C]oercive police activity is a necessary predicate to the finding the a [statement] is not 'voluntary' within the meaning of the Due Process Clause." *Braxton*, 112 F.3d at 780 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)); *see also Elstad*, 470 U.S. at 314 ("[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.").

"The proper inquiry is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired." *Id.* at 780–81 (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)). The court considers "'the totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and details of the interrogation." *Braxton*, 112 F.3d at 781 (quoting *Pelton*, 835 F.2d at 1071).

Although Ramirez was in custody for *Miranda* purposes when Deputies Bridgeforth and White asked him the on-scene questions, his unwarned responses were not the product of coercive police activity, and the deputies did not use any technique or method that offends due process or even delicate sensibilities. *See Elie*, 111 F.3d at 1143. Nothing in the record, including the body-cam video, credibly suggests that Ramirez's will was overborne, and there is no evidence that either deputy harmed, or threatened to harm, Ramirez if he refused to answer their questions; that they deprived him of anything; that they used any improper influence; or that they deceived or attempted to deceive him. *See Braxton*, 112 F.3d at 780; *Elie*, 111 F.3d at 1143; *see also Connelly*, 479 U.S. at 164 n.1 (collecting cases illustrating coercive police misconduct).[9] The period of questioning was short, consisting of two short series of a

---

[9] The cases cited in *Connolly* illustrate the *wide* gulf between police misconduct sufficient to render a confession involuntary and the deputies conduct on the side of Interstate 81. *E.g., Mincey v. Arizona,* 437 U.S. 385 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); *Greenwald v. Wisconsin,* 390 U.S. 519 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); *Beecher v. Alabama,* 389 U.S. 35 (1967) (police officers held gun to the head of wounded confessant to extract confession); *Davis v. North Carolina,* 384 U.S. 737 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); *Reck v. Pate,* 367 U.S. 433 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); *Culombe v. Connecticut,* 367 U.S. 568 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); *Payne v. Arkansas,* 356 U.S. 560 (1958) (defendant held incommunicado for three days with little food; confession obtained when officers informed defendant that Chief of Police was preparing to admit lynch mob into jail); *Ashcraft v. Tennessee,* 322 U.S. 143 (1944) (defendant questioned by relays of officers for 36 hours without an opportunity for sleep).

few questions each: first, about where Ramirez lived and what he was doing in Virginia (Video A at 14:24:15–14:24:38); then, shortly thereafter, about the cash Reyes purportedly gave to Ramirez and its location in the vehicle (*Id.* at 14:32:22–14:32:45). *See, e.g., Braxton*, 112 F.3d at 785 (finding "confession not involuntary" when interview was only one hour in duration); *Elie*, 111 F.3d at 1143.

Moreover, there is no evidence that Ramirez's age, mental capacity, or level of education made him especially susceptible to police coercion.[10] It is evident from the video footage of the interaction that Ramirez understands little but some English. But in the brief period of time when the deputies and Ramirez communicated, the deputies used what minimal Spanish-language skills they had to effectively communicate with Ramirez. The body-cam footage indicates that Ramirez knew what he was being asked *and* what he was saying in response. Simply put, when the deputies asked him whether the money was, Ramirez provided the correct location. And when he didn't understand what was being asked of him, he communicated that clearly as well.

In sum, Ramirez was not coerced, and his will was not overborne; his unwarned on-scene statements were voluntary under the Fifth Amendment. *See Connelly*, 479 U.S. at 167. The physical evidence recovered from Ramirez's SUV, therefore, is not subject to suppression on the basis of any nexus it may have to his on-scene statements. *See Patane*, 542 U.S. at 643; *Sterling*, 283 F.3d at 218–19.

---

[10] The fact that Deputy Bridgeforth handcuffed Ramirez, on its own, does not establish involuntariness. *See Hill v. Clarke*, 2014 WL 6388431 at *8 (citing *Elie*, 111 F.3d at 1144) (reaffirming that "neither drawing of a gun by the interrogating officer nor the handcuffing of the confessor 'establish[es] involuntariness in and of [itself]'") (quoting *United States v. Seni*, 662 F.2d 277, 281 (4th Cir. 1981)).

## C. Conclusion

The vehicle search was justified under the automobile exception to the Fourth Amendment's warrant requirement. Ramirez's motion to suppress the resulting physical evidence will be denied.

## IV. RAMIREZ'S MOTION TO SUPPRESS STATEMENTS MADE TO DEPUTIES AND TO THE MAGISTRATE

Ramirez next moves to suppress statements he made to deputies and at a probable cause hearing before the state magistrate. (*See* ECF No. 55.) For the following reasons, his motion will be granted in part and denied in part.

### A. The On-Scene Statements Made to Police

Because the government has committed that it will neither introduce nor rely on Ramirez's on-scene statements to deputies in its case-in-chief at trial (*see* Gov.'s Br. in Opp. to Mot. to Supp. Statements at 2), the court will deny this portion of Ramirez's motion as moot. *United States v. Holcomb*, No. 1:20 CR 78 MR WCM, 2020 WL 7647788, at *1 (W.D.N.C. Dec. 4, 2020), (R&R), *adopted by* No. 1:20-CR-00078-MR-WCM, 2020 WL 7646810 (W.D.N.C. Dec. 23, 2020) (dismissing as moot defendant's motion to suppress a prior identification of defendant where government committed not to use the identification in its case-in-chief), (R&R), *adopted by* 2020 WL 7646810 (W.D.N.C. Dec. 23, 2020).

### B. The Statements Made to the Magistrate

But since the court is not persuaded that the Spanish-to-English translation was reliable, and because the government failed to produce the translator—or even the magistrate—for cross-examination, the court will suppress Ramirez's purported statements to the magistrate on Sixth Amendment and hearsay grounds.

After his arrest, Deputy Bridgeforth transported Ramirez to the Northwestern Regional Adult Detention Center and presented Ramirez to a state magistrate for a probable cause hearing and initial bond determination. The magistrate was positioned in an office behind a plate-glass window, with an intercom that facilitated communication through the window. Upon bringing Ramirez to the window, Deputy Bridgeforth testified that he informed the magistrate that Ramirez needed a Spanish translator, and the magistrate got a translation service on the telephone. The translator was on speakerphone, and Deputy Bridgeforth testified that he could hear the translator through the intercom.[11]

The magistrate placed Deputy Bridgeforth under oath and asked him what had happened. Deputy Bridgeforth proceeded to read to the magistrate the probable cause statement from his written criminal complaint. The magistrate then turned to Ramirez and warned Ramirez that anything he said could be used against him and that Deputy Bridgeforth was standing right there behind him. Ramirez purportedly proceeded to effectively confess to counts I and II to the magistrate, as Deputy Bridgeforth recorded in his police report:

> Mr. Ramirez [Ramirez] spoke to [the magistrate] with the assistance of a translation service and during this conversation he advised he was hired to bring a juvenile male from Guatemala to Virginia for $1,000. [Ramirez] also explained that he drove away and did not turn the juvenile over to the person that hired him because he was not paid the agreed amount.

---

[11] This process was not uncommon. In the approximately 100–150 times Deputy Bridgeforth has brought an arrestee to the magistrate, he has used the translation services in this way about ten times, but he does not know the name of the translator or even the translation service used.

(Deputy Bridgeforth's Incident Report at 4.) The magistrate's bond justification narrative recites much of the same information that Deputy Bridgeforth's Incident Report says Ramirez confessed to, but does not attribute any statement to Ramirez:

> [A]ccused transported child from Guatemala to Virginia. The family paid him to do this. Afterwords [*sic*] the accused demanded more money from family, who was there and refused to let child go. Child was interviewed and stated he tried to get out but accused locked the car doors. No ties to the area, extreme circumstances of this case indicated a major public risk if accused is released. Accused counter claims family was there threatening him with a firearm.

(Magistrate's Checklist for Bail Determinations – Def.'s Hearing Ex. 2 [ECF No. 98-2].)[12] And since there is no recording or transcript of the magistrate proceeding, the government has left the court to rely on the hearsay testimony of non-Spanish-speaking Deputy Bridgeforth, who is not able to certify the accuracy of a translated confession in a language he does not speak. This is not constitutionally sufficient.

"Except in unusual circumstances, an interpreter is no more than a language conduit" *United States v. Vidacak*, 553 F.3d 344, 352 (4th Cir. 2009) (cleaned up), and the court ordinarily does not need to examine his or her skills or translative abilities to accept as accurate statements that they translated as part of official court records. The Fourth Circuit recognizes "a narrow exception that is applied where the particular facts of the case cast significant doubt upon the accuracy of a translated confession." *Id.* (cleaned up). Where the court has such significant doubt, "'the translator or a witness who heard and understood the untranslated

---

[12] The magistrate's Checklist for Bail Determinations does not expressly indicate that Ramirez made these statements, only that these were the facts or allegations as he understood them to be justifying his bond determination. It is quite possible that these were the facts as Deputy Bridgeforth read them to the magistrate, and were not intended to indicate anything Ramirez said. Still, the inconsistencies serve only to raise significant doubt as to the translation's reliability.

confession must be available for testimony and cross-examination' before the statement can be admitted." *Id.* (quoting *United States v. Martinez-Gayton*, 213 F.3d 890, 891 (5th Cir. 2000)). "In order to determine if this 'narrow' exception applies, *Vidacak* identifies four factors for district courts to consider: '1) which party supplied the interpreter; 2) whether the interpreter had a motive to mislead or distort; 3) the interpreter's qualifications and language skills; and 4) whether actions taken subsequent to the conversation were consistent with the statements translated.'" *U.S. v. Kaixiang Zhu*, 854 F.3d 247, 258–59 (4th Cir. 2017) (quoting *Vidacak*, 553 F.3d at 352 (cleaned up)).

The facts here "cast significant doubt upon the accuracy of [Ramirez's] translated confession." *Vidacak* at 352. At the outset, the government cannot identify the translator. (Def.'s Br. in Reply to Mot. to Supp. Statements at 4–5 [ECF No. 75].) Beyond failing to identify the interpreter, though, there is no transcript or recording of the probable cause and bond hearing. The government did not produce the interpreter or the magistrate at the hearing, so neither was subjected to cross-examination.[13] The court does not even have before it any evidence identifying the translation *service* used, let alone the competency, qualifications, or certification status of the interpreter.

---

[13] At the hearing the government represented that the state magistrate had refused its request to appear and testify regarding the presentment hearing. According to the government, the magistrate had protested that the Rules of the Supreme Court of Virginia prohibited him from being compelled to testify, even in federal court. The government apparently accepted the magistrate's explanation at face value and did not attempt to subpoena him to the suppression hearing. For myriad reasons, the court is dubious that Virginia court rules immunize a state magistrate from providing relevant and necessary testimony in a *federal* criminal proceeding. Indeed, the magistrate was in the best position to provide critical testimony regarding the interpretation issues underlying the purported confession, and his testimony, had it been obtained, might have resulted in a different outcome. *See, e.g., Vidacek*, 553 F.3d at 352 (holding that there was no hearsay issue where the non-testifying interpreter was identified, the court was able to evaluate her credentials, and the case officer testified that she was "one of the best interpreters with whom she had ever worked.").

Turning to *Vidacak*'s four factors: here, the government supplied the interpreter. The briefs indicate that it *may* have been through a neutral, third-party company—Certified Languages International—but there is no evidence of this. Since the government has not identified the interpreter, there is no testimony about the interpreter's qualifications and language skills. Deputy Bridgeforth was unable to testify to the accuracy of the translation since he does not speak Spanish. Deputy Bridgeforth testified that he could hear the magistrate, Ramirez, and the translator clearly, and that he heard the translation of what Ramirez said to the magistrate. But, again, Deputy Bridgeforth does not speak Spanish, and he never spoke directly to the interpreter. Moreover, Deputy Bridgeforth testified that his Incident Report's narrative is not verbatim what Ramirez said (as translated). Rather, it is his recollection from two days later when he wrote his Incident Report on November 23, 2021. (*See* Deputy Bridgeforth's Incident Report at 3.)

Second, there is no indication one way or another whether the interpreter had a motive to mislead or distort. Third, there is no indication whether the interpreter harbored any bias against Ramirez. This is not to say that the court presumes either, only that, without the identity of the interpreter or the interpretative services used, the court cannot adequately consider the factors.

Finally, the context of Ramirez's statement to the magistrate indicates that it is unreliable. Ramirez invoked his right to remain silent on the scene, and the government seeks to introduce what amounts to a confession that Ramirez made to the magistrate sometime later that same day. It is odd that Ramirez purportedly told the magistrate that he transported Minor #1 from Guatemala, when, in fact, it appears that he only transported him from

Arizona.[14] Also, it seems unlikely that Ramirez would mention on the scene twice that Reyes or Ralda had pulled a gun on him—once to deputies (*see* Video A 14:24:08–14:24:14 (Ramirez stating twice to Deputy White, "pistola," while motioning with his head toward Reyes's vehicle)) and once to Officer Seabaugh (*see* Deputy Bridgeforth Incident Report at 4)—but then omit that exculpatory statement from his purported explanation to the magistrate (as recorded by Deputy Bridgeforth). (*See* Deputy Bridgeforth Incident Report at 4 (indicating that Ramirez, in his statement to the magistrate attributed his driving away from the meeting point to Reyes's refusal to pay the agreed amount, with no mention of the gun).) A translated (but unverified), non-contemporaneous, and non-verbatim summary of a criminal defendant's confession does not, under these unique circumstances, pass constitutional muster.

In sum, the facts of this case cast significant doubt on the accuracy of Ramirez's statement to the magistrate—as translated by the unidentified translation service and recorded by Deputy Bridgeforth two days later—and this is not a situation where the "interpreter was no more than a language conduit and therefore his translation does not create an additional level of hearsay." *Vidacak*, 553 F.3d at 352 (cleaned up). Ultimately, the court agrees with Ramirez that even a slight misinterpretation of Ramirez's purported statement could severely prejudice his constitutional rights, especially where, as here, the statement effectively amounts to a confession. The same is true for any mis-recording that may have resulted from Deputy Bridgeforth's non-verbatim memorialization, two days after the fact, of what Ramirez had allegedly said to the magistrate.

---

[14] There may or may not be a factual dispute over this, and the court does not decide it here.

To protect Ramirez's Sixth Amendment right to confront his accuser, the court will grant Ramirez's motion to suppress his statements to the magistrate.[15]

## C. The Statements Made to Deputy Bridgeforth about Retrieving Phone Numbers from Ramirez's Cell Phone

Finally, Ramirez argues that any purported statements he made to Deputy Bridgeforth regarding inputting his cell phone security pin to unlock his cell phone and retrieving phone numbers from it should be suppressed because Ramirez's consent was invalid. (Def.'s Br. in Supp. Mot. to Supp. Statements at 9–10.) The basis of Ramirez's argument is, again, that a translation service and not an interpreter was used when he and Deputy Bridgeforth were communicating. (*Id.*)

Deputy Bridgeforth testified that Ramirez initiated a conversation with him following his arrest and asked the deputy to retrieve a phone number from his cell phone (presumably to make a phone call from the facility at which Deputy Bridgeforth was processing his arrest). Deputy Bridgeforth explained to Ramirez that he would need his consent to access the phone and retrieve any phone number, so Deputy Bridgeforth used the telephone translation services that his department uses—Voiance Translation Services. Ramirez allegedly consented to this limited search with the assistance of a translation service the deputy regularly utilized. Deputy Bridgeforth then unlocked Ramirez's phone and retrieved the requested phone number for him.

---

[15] Because Ramirez's purported statements to the magistrate are being suppressed on this ground, the court need not, and does not, reach the issues of: whether Ramirez's appearance at the probable cause hearing before the magistrate was a "critical stage" in the prosecution at which the Sixth Amendment required counsel to have been present; whether Virginia Supreme Court Rule 2:604 was complied with and whether such a violation (if there was one) amounted to a constitutional violation; and whether the use of Spanish and not Zapotec— Ramirez's "native language (*see* Def.'s Br. in Reply to Mot. to Supp. Statements at 3 [ECF No. 75])—rose to the level of a constitutional violation.

The government represented at the hearing on these motions that it is not arguing that Ramirez, by providing his PIN to Deputy Bridgeforth and authorizing him to retrieve a phone number for him, consented to a broader search of his cell phone. Instead, the government is relying on the search warrant it later obtained for the cell phone to justify introducing data retrieved from it in its case-in-chief. Accordingly, this discrete portion of Ramirez's motion to suppress will be denied as moot. And insofar as Ramirez's motion to suppress statements is arguing for suppression of the *contents* of his cell phone—distinct from his *statements* relating to it—that search was authorized by a search warrant supported by probable cause, as discussed in detail below.

### D. Conclusion

For the reasons given, Ramirez's motion to suppress his on-scene statements to deputies will be denied as moot, his motion to suppress his statements to the magistrate will be granted, and his motion to suppress statements related to unlocking his cell phone to retrieve a phone number will be denied as moot.

### V.   RAMIREZ'S MOTION TO SUPPRESS EVIDENCE UNCOVERED AS A RESULT OF THE SEARCH OF HIS CELL PHONE

Ramirez also moves the court to suppress evidence obtained from the search of his cell phone. (*See* ECF No. 53.) Ramirez argues that the search violated the Fourth Amendment because it was based on a warrant that lacked probable cause and was devoid of particularity. (Def.'s Br. Supp. Mot. to Supp. Cell Data at 7 [ECF No. 53].) He contends that the warrant authorized law enforcement to search the entire phone, while the affidavit "offered no explanation of the place to be searched or the things to be seized." (*Id.*) The government counters that the search warrant was based on probable cause and was sufficiently particular

because it described the offense being investigated. (Gov.'s Br. in Opp. to Mot. to Supp. Cell Data at 1 [ECF No. 63].) The government further argues that even if the search warrant was deficient, the court should apply the good-faith exception to the exclusionary rule. (*Id.*) For the following reasons, the court agrees with the government.

### A. Probable Cause

Ramirez first argues that the affidavit, in its original form, failed to establish probable cause for the search.

The government must obtain a search warrant supported by probable cause prior to searching an individual's cell phone. *See* U.S. Const. amend. IV; *Riley v. California*, 573 U.S. 373, 403 (2014). "Probable cause requires only a fair probability, and not a prima facie showing, that contraband or evidence of a crime will be found in a particular place." *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) (cleaned up) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause, in other words, is "not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018).

"[A] judicial officer issuing a search warrant must simply make a practical, commonsense determination—based on the totality of the circumstances *revealed in the affidavit*—of whether there is a substantial likelihood that evidence of a crime will be found in a particular place." *United States v. Allen*, 631 F.3d 164, 173 (4th Cir. 2011) (emphasis added). This court reviews a magistrate's decision to issue a search warrant "with great deference, asking only whether the judicial officer had a substantial basis for finding probable cause." *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (cleaned up). In so doing, the court

only considers the facts contained in the warrant affidavit. *Bosyk*, 933 F.3d at 325 (citing *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018)).

Here, Deputy Bridgeforth's affidavit clearly demonstrates sufficient probable cause for a neutral magistrate to issue the warrant in question:

> On 11/23/2021, I arrested Luis Ramirez in an incident where he admitted to transporting a juvenile male subject from Guatemala to Virginia for $1,000. Luis Ramirez then refused to turn over the juvenile to his family and contacted the family via telephone requesting more money before turning the juvenile over to them. The phone was seized from Luis Ramirez's pocket in a search incident to arrest. No other phone was located in search of Luis Ramirez's vehicle.

(Bridgeforth Aff. at 4 [ECF No. 53-1].) The affidavit clearly describes that Ramirez was arrested, why he was arrested, and that he was alleged to have used a cell phone in commission of the offense. The affidavit also indicates that there were no other cell phones found in the vehicle search, indicating that the cell phone police seized was the one allegedly used in the commission of the crime under investigation. Using common sense, a neutral magistrate could easily determine that there was "a substantial likelihood that evidence of a crime" would be found on the cell phone. *Allen*, 631 F.3d at 173. Accordingly, the warrant issued for the search of Ramirez's cell phone was adequately supported by probable cause.

## B. Particularity

Ramirez next contends that the search warrant was "devoid" of particularity and overly broad, but he cites no Fourth Circuit precedent to support this argument. "Unlike the probable cause requirement, which concerns the showing made by an officer *seeking* a search warrant, the particularity requirement is focused as well on the officer *executing* a warrant, and ensures that the search will be carefully tailored to its justifications rather than becoming a wide-

ranging exploratory search of the kind the Framers intended to prohibit." *United States v. Cobb*, 970 F.3d 319, 326 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1750 (2021) (cleaned up) (quoting *Blakeney*, 949 F.3d at 861). "Accordingly, what particularity demands in this context is that the executing officer reasonably can ascertain and identify from the warrant the place to be searched and the items to be seized." *Blakeney*, 949 F.3d at 861.

In his motion to suppress, Ramirez specifically challenges the search warrant's particularity on the basis that it authorized the search of "all data" on his cell phone. Ramirez contends that permitting the government to search the entire phone is akin to "indiscriminate rummaging" and "wide ranging exploratory searching" that the particularity requirement is meant to prevent. (Def.'s Br. Supp. Mot. to Supp. Cell Data at 7.) Stated simply, Ramirez argues that the warrant was not narrowly tailored to specify what data was to be searched for, or where, or exactly what was to be seized. The court disagrees.

Although there is no general particularity requirement in the Fourth Amendment, what is clear, is that "so long as there is probable cause to believe that contraband or evidence of a crime will be found in a particular place, the Fourth Amendment specifies only two matters that must be particularly described in the warrant: the place to be searched and the persons or things to be seized." *Cobb*, 970 F.3d at 326 (cleaned up) (quoting *United States v. Grubbs*, 547 U.S. 90, 97 (2006)); *see also Blakeney*, 949 F.3d at 862. As discussed *supra*, the warrant at issue here was adequately supported by probable cause suggesting that evidence of a crime would be found on Ramirez's cell phone. Therefore, the analysis hinges on whether the warrant contained an adequate description of the places to be searched and the things to be seized.

In this instance, while the face of the warrant does not describe categories, specific pieces of evidence to be seized, or a crime limiting a search, the affidavit does. In the Fourth Circuit, "it is sufficient either for the warrant to incorporate the supporting document by reference or for the supporting affidavit to be attached to the warrant itself." *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006). The affidavit was appended to the warrant. The affidavit, therefore, is construed as incorporated by the warrant for the purposes of particularity. *Hurwitz*, 459 F.3d at 473. The affidavit specifies that "[a] search is requested in relation to an offense substantially described as follows: Virginia Code 18.2-47 Abduction." (Bridgeforth Aff. at 3.) The affidavit goes on to state, the "things or persons to be searched for are described as follows: All digital data contained within the device," which was listed as "a black in color iPhone belonging to Luis Ramirez." (*Id.*)

While the affidavit requests a search for "all digital data," "where a warrant does not otherwise describe the evidence to be seized, that gap can be filled . . . if the warrant instead specifies the relevant offense," as it does here. *Cobb*, 970 F.3d at 327 (cleaned up) (citing *Blakeney*, 949 F.3d at 862–63 (noting that "a warrant may satisfy the particularity requirement *either* by identifying the items to be seized by reference to a suspected criminal offense *or* by describing them in a manner that allows an executing officer to know precisely what he has been authorized to search for and seize")). Kidnapping (abduction) is a "specific illegal activity" that generates quite distinctive evidence, such that a warrant's reference to kidnapping makes it possible for officers to identify the property sought with reasonable certainty—in a way that reference to a broader criminal offense, like fraud or conspiracy, would not. *See United States v. Dickerson*, 166 F.3d 667, 693–94 (4th Cir. 1999). As applied, the warrant limits the

officers' ability to search for "all digital data" on Ramirez's cell phone related only to the alleged kidnapping.

To the extent that Ramirez's challenge speaks more to the requisite specificity of the "place" to be searched when the "place" is a cell phone, similar challenges have failed in the Fourth Circuit. Although Ramirez believes the search was "a fishing expedition" (Def.'s Reply Br. at 2 [ECF No. 74]), the court has twice rejected a paradigm that would require, in the context of searches of electronic devices, warrants to describe the manner of the search or constrain it to items already known to law enforcement. *See, e.g.*, *United States v. Skinner*, No. 3:19CR19, 2021 WL 1725543, at *15 (E.D. Va. Apr. 29, 2021) (citing *Cobb*, 970 F.3d at 328; *Williams*, 592 F.3d at 521–22). And this makes sense. Officers cannot be required to know all the evidence of a crime before they are permitted to investigate it, such that they would be able to provide the specificity that Ramirez demands in the warrant application.

In *United States v. Williams*, the Fourth Circuit addressed a challenge to a warrant that authorized the search of a defendant's computer for evidence of specific crimes, during which the officers inadvertently discovered images of child pornography. 592 F.3d 511 (4th Cir. 2010). In addressing the application of the plain-view exception, the court held "that, so long as the Fourth Amendment's basic requirements of probable cause and particularity are met, the executing officers are impliedly authorized . . . to open each file on the computer and view its contents, at least cursorily, to determine whether the file falls within the scope of the warrant's authorization—*i.e.*, whether it relates to the designated crimes." *Williams*, 592 F.3d at 521–22; *Cobb*, 970 F.3d at 329. Similarly, in *Cobb*, the Fourth Circuit upheld a search warrant for a computer that was challenged based on its alleged lack of particularity. In upholding the

search warrant, the Fourth Circuit held that the "warrant . . . was sufficiently particular because it . . . confined the executing officers' discretion by allowing them to search the computer and seize evidence of a specific illegal activity—murder." *Cobb*, 970 F.3d at 328.

These holdings equally extend to cell phones because they are analogous to computers. *Riley*, 573 U.S. at 393 (stating that cell phones are "in fact minicomputers that also happen to have the capacity to be used as a telephone."). Officers, therefore, are generally not required to predict the items of evidence that an electronic search will uncover or predict where on the cell phone the evidence will be found. This does not give officers *carte blanche* to search wherever they want, but instead constrains their discretion based on the specific crime listed in the affidavit and requires them to view innocuous files "cursorily." *Cobb*, 970 F.3d at 329.

Consequently, the court rejects Ramirez's contention that the warrant should have described the types of files sought, the location of the files, or the specific relationship between the files and the information that law enforcement had about the alleged kidnapping. *Accord id.* at 328. Like the defendant in *Cobb*, Ramirez "does not explain, in any meaningful way, how the warrant could have specified the specific files that would contain evidence of his alleged crimes." *Id.* Even assuming that the warrant could have been more specific, the Fourth Amendment does not demand it. *Id.*

In sum, while the warrant itself authorizes a search of "all data," the Fourth Circuit permits the affidavit to be read in conjunction with the warrant if it was appended to the warrant, as it was here. Because the affidavit specifically cites and describes the crime of abduction—which is a unique crime that generates distinct evidence—the warrant is sufficiently particular such that officers "can ascertain and identify from the warrant the place

to be searched and the items to be seized." *Blakeney*, 949 F.3d at 861. Reading the warrant together with the affidavit, the scope of the search was limited by the description of the crime that was identified in the affidavit. As such, the warrant at issue was reasonably particular.

## C. Good Faith

Even if the search warrant was technically deficient, the good-faith exception prevents the court from excluding the evidence found on Ramirez's cell phone.

The exclusionary rule "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 232 (2011). But under the good-faith exception, "evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective is not subject to suppression, despite the existence of a constitutional violation." *United States v. Brunson*, 968 F.3d 325, 334 (4th Cir. 2020) (cleaned up).

Courts have recognized four scenarios when the good-faith exception will not apply: (1) when the magistrate is misled by information in a search warrant affidavit that the agent knew was false or would have known was false but for the agent's reckless disregard for the truth; (2) when the magistrate "wholly abandoned his judicial role"; (3) when the affidavit is so "lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *United States v. Doyle*, 650 F.3d 460, 467 (4th Cir. 2011). On reply, Ramirez contends that the second, third, and fourth scenarios are relevant. (Def.'s Reply Br. at 4.) Specifically, he contends that the magistrate acted as a rubber stamp, the

warrant lacked probable cause, and that the warrant was not sufficiently particular. (*Id.* at 4–5.)

As to Ramirez's first contention—that the good-faith exception should not apply because the magistrate acted as a "rubber stamp"—the court disagrees. In *United States v. Leon,* the Supreme Court held that, when a magistrate abandons his neutral role "in the manner condemned in *Lo–Ji Sales, Inc. v. New York,*" then the good-faith exception should not apply. 468 U.S. 897, 923 (1984). In *Lo–Ji Sales,* an investigator for the New York State Police sought a warrant to search an adult bookstore and presented a local magistrate with two allegedly obscene films along with an affidavit indicating that "similar" films were present in the bookstore. 442 U.S. 319, 321 (1979). After viewing the two films, the magistrate issued a warrant authorizing a search of the bookstore for items determined to be possessed in violation of New York law. *Id.* at 321–22. The warrant did not list those items; instead, the magistrate accompanied law enforcement officers on a search of the bookstore, examined the materials therein to assess their obscenity, then authorized the seizure of the items deemed obscene. *Id.* at 326–27. The Supreme Court stated that the magistrate "was not acting as a judicial officer but as an adjunct law enforcement officer." *Id.* at 327. Following *Leon*'s express reference to the unacceptability of the magistrate's conduct in *Lo–Ji Sales,* the Fourth Circuit held that the good-faith exception cannot apply "where the issuing magistrate wholly abandoned his judicial role as a detached and neutral decisionmaker." *United States v. Andrews,* 577 F.3d 231, 236 (4th Cir.2009) (quoting *Leon,* 468 U.S. at 923).

Here, Ramirez does not contend that the magistrate issued an open-ended warrant or executed the search alongside law enforcement officers as did the magistrate in *Lo–Ji Sales.*

And while the Fourth Circuit has held that a magistrate abandons his judicial role when issuing a warrant based on a "bare bones affidavit," *United States v. Wilhelm,* 80 F.3d 116, 121–23 (4th Cir.1996), if a magistrate issues a warrant on the basis of nonconclusory statements that nonetheless fail to establish probable cause, the reasonableness of the officer's execution of the warrant is better analyzed under the third circumstance discussed in *Leon,* which the court addresses below. *See Andrews,* 577 F.3d at 240 (stating that a "rubber stamp" challenge to judicial neutrality "essentially . . . recasts a defendant's argument that no officer could reasonably rely on the warrant because there was an insufficient basis for a probable cause finding") (cleaned up). Accordingly, the court concludes that the magistrate did not abandon his judicial role by granting the search warrant for Ramirez's cell phone.

As to Ramirez's contentions that the affidavit was either so lacking in probable cause or so facially deficient that officers' reliance on the warrant was unreasonable, the court disagrees. (Def.'s Reply Br. at 5.) Because "the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Leon*, 468 U.S. at 919. As discussed *supra*, the warrant was adequately supported by probable cause and was sufficiently particular to justify the search for evidence of kidnapping. Indeed, the affidavit, which was appended to the search warrant, adequately specified why Ramirez was arrested, stated that he used a cell phone in furtherance of the offense, and listed the specific crime for which evidence was sought.

But even if the warrant was not supported by probable cause, the court believes that suppression would have no deterrent value here. As the Supreme Court stated in *Riley*, "our answer to the question of what police must do before searching a cell phone . . . is accordingly simple—get a warrant." 573 U.S. at 403. That is exactly what officers did here. There is nothing to indicate that officers did not reasonably rely on the warrant, nor did they possess knowledge of any possible technical deficiencies. Moreover, the warrant was not so technically deficient that a reasonable officer would have known not to rely on it.

### D. Conclusion

The court finds that the warrant was adequately supported by probable cause to believe that evidence of kidnapping would be found on Ramirez's cell phone. The warrant was also sufficiently particular because the affidavit, which was appended to the warrant, defined a specific crime for which evidence was to be searched for, thus limiting officer discretion in their subsequent search. Moreover, even if the warrant was deficient in some way, the officers' reliance on it was reasonable, and suppression here would not serve the deterrent purpose which it is designed to achieve. Deputy Bridgeforth did everything he was supposed to—stated his reasons for probable cause and relied on a neutral magistrate to issue a warrant.

Accordingly, Ramirez's motion to suppress evidence obtained from the search of his cell phone will be denied.

### VI.   CONCLUSION

For the reasons discussed *supra*, Ramirez's motion to suppress evidence obtained during the vehicle search will be denied; his motion to suppress statements will be denied as

moot as to his on-scene statements to deputies, but granted as to his statements to the magistrate; and his motion to suppress the cell phone data will be denied.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 23rd day of November, 2022.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE